Good morning, Your Honors. Paul Barr, Federal Defender, Sorority Appellant, Mr. Vasquez-Olea. Your Honors, the trial court erred in this case when it admitted testimony about two statements purportedly made by Mr. Vasquez. And for today, I'd like to focus on one of those statements, which was a recording of a phone call that was made from the MCC in San Diego. And that phone call, the testimony about that phone call, should have been excluded on two separate, though related, grounds. The first is the testimony provided by Agent Hobart was expert testimony. And even if Agent Hobart was properly qualified to testify as an expert regarding the Spanish language, his testimony should have been excluded nonetheless. And there are two reasons for that. First, the notice that the government provided of Agent Hobart's expert testimony was deficient because it was not timely. I received notice of that expert witness the day before trial. And similarly, the notice was deficient because it did not specify the substance of Agent Hobart's testimony. And there may be practical reasons for that, that the government itself didn't know that Agent Hobart had not himself yet had a chance to review the recording in question. But nonetheless, I think that the testimony that he gave is really paradigmatic of the reason of why these notice requirements are in place. And the reason for – yes. Excuse me. One of the questions that was troubling me as I went through the brief was, you didn't allege in the brief or state that there was anything wrong with the translation or that more time or notice or information would have made a difference. Can you address that? Well, Your Honor, at the time of trial, it was a matter of expediency, that I myself had not had an opportunity or my – I had not had an opportunity to have an interpreter, my own interpreter, review the phone call. So I myself was not entirely aware of what the phone call contained. I did have the recording. I listened to it. But it wasn't Spanish. The recording was of sort of middling quality. And I myself did not know. So I didn't really have an opportunity to test the accuracy of Agent Hobart's. But I have a question about that. The magistrate judge offered you a continuance, and you did not – you did not accept that offer. Your Honor, two things about that. First, I think that's actually not exactly what happened. If we look at the record on pages 114 to 116 of the excerpts, I raised this issue about my concerns regarding the testimony of Agent Hobart. And the judge asked, you know, is it really necessary that we have a continuance? So he did not offer a continuance at that time. And my position was that I was concerned that there was the prospect of prejudice to Mr. Vasquez because he was being charged with a class B misdemeanor. The amount of custodial time that he was looking at if he were convicted was fairly short. And so any continuance had the very real possibility of prejudicing Mr. Vasquez by keeping him in custody longer than he might otherwise have been. And I think also that we can sort of infer that the judge really wasn't offering a continuance because my actual request to the judge was to continue the trial to the afternoon so that I might have an opportunity to have an interpreter review the phone call in question and or to prepare for a DABRA hearing so that I could properly examine Agent Hobart about his qualifications. And so the fact that the judge declined my request to continue the trial to the afternoon, I think speaks to the way that the Court was actually viewing the matter, which was that a continuance was not really on the table. And though it was not something that I was actively seeking, I don't think that it was really available. And I think that that's a reasonable inference to make based on how the trial, in fact, unfolded. Well, on page 114 of the excerpt, Mr. Barr, I'm not seeking to continue the trial out for another day. I'm sort of hamstrung here and et cetera, et cetera. It seemed to me that you were not accepting and not – first you said I didn't have time to look into this and then you said I'm not seeking a continuance. Well, again, Your Honor, in the section in the Court's words prior to that portion that Your Honor just quoted, the judge sort of says, well, is there really a need to continue this case? And, again, I said I'm not seeking continuance for the reasons I've already articulated. What I am seeking is just a little bit of time today to prepare for an examination of the agent and to prepare to allow my interpreter to review the phone call in question. And that request was at least tacitly denied because the proceedings went forward. We did not have an opportunity to review that. But if you had asked for a continuance, it sounded like the Court was willing to give you one. And isn't that the typical remedy for if there were Rule 16 violations? Well, again, Your Honor, I don't deny that I expressly said that I was not seeking a continuance for the reasons I've said, that it could prejudice Mr. Vasquez. But I was requesting instead what I think is a less severe remedy, which is just a couple of hours on the day of trial to prepare for the evidence that was going to be presented. And that request was denied. So I think that it's a reasonable inference to say that even if I had been requesting a continuance, that that was not an option that was available to me at that time. And I think that the problems with the effectiveness of the notice are evident from the type of testimony that Agent Tobar was giving. There was really no opportunity for me to effectively cross-examine or test the accuracy of his translation because I really had nothing with which to test it. It was only his words interpreting the Spanish language into the English language. And there was nothing with which I could really call into question his interpretation because I had no benefit of my own expert at that time to test the accuracy of his translation. Which, if you had a continuance, you could have obtained. Possibly so, Your Honor. But again, there were other concerns in play. All right. I understand. Counsel, if I may, if I could interject one quick question. In regard to the idea of letting you have until the afternoon, did the judge give a reason for declining to let this go into the afternoon, at your request? Your Honor, what the judge essentially said was, I think we need to wait and see what happens. And the issue never was really revisited at any point, but at that point the judge decided that there wasn't an adequate basis to have a Daubert hearing  I don't think that the court was convinced of my position that Agent Tobar's testimony was expert testimony, although that's my own inference. He doesn't actually ever say that in the record. But I do think that this testimony is squarely within the purview of Rule 702, that this is specialized knowledge. And a case that both I and the government rely on, in discussion of Agent Tobar's qualifications to be an expert, I think does speak to the issue about an agent being an expert witness when he's talking about translation from Spanish to English. And that latter case, Obonse, discusses why the agent in that case was qualified to serve as an expert in that case. And there's really no discussion in the case about whether or not this is expert testimony. It's really just assumed. And the only question in Obonse is whether this particular individual was qualified. So I think that this Court certainly has at least implicitly recognized that an individual who's testifying about the contents of a conversation that occur in a foreign language is, in fact, expert testimony. And I think that this Court should consider it as such. And that because the notice was deficient, the statements from that phone call should be excluded. Your Honor, unless there's other questions at this time. I have one quick question. Yes, Your Honor. On your argument about Vasquez's field statement, how do you distinguish Cervantes Flores, where the Border Patrol officer chased after the guy, subdued him instead of handcuffed him, and yet we said that that was a Terry stop? Obviously, these cases are difficult, Your Honor, because they're very fact-intensive. And the question of whether an individual is in custody is going to be very fact-intensive. I think that the primary distinction with Cervantes is this question of flight, that Mr. Cervantes in that case was walking along the road when he saw the agent in question. He took off into the fields and ran away, and that there was a need to apply the handcuffs and to subdue the individual to maintain contact with him and ensure that he wasn't going to leave. There was no such concern here. There was no flight by Mr. Vasquez or any of the other individuals in the group. You said that he was concerned about being, he says, I was afraid they would attempt to attack me or run away or do something that could cause harm to me, is what Agent Barr testified. Yes, Your Honor. Agent Barr approached the group. He drew his weapon in an effort presumably to maintain or to ensure that no one left. I think that by doing that, he is constructively placing Mr. Vasquez into a custodial type of setting where Mr. Vasquez is not free to leave, but this is not a Cervantes setting where there's already been a demonstrated action or effort by the individual to leave the area in question. I acknowledge that there's a lot of thin slicing going on here and that it's sometimes difficult to distinguish these cases, but I do think that these facts are significantly different or substantially different to be able to draw that distinction. And so your point is nobody ran away and no one threatened the agent. Yes, Your Honor, precisely. You're over time. I'll give you a minute for a rebuttal. Thank you, Your Honor. Okay. We'll hear from the government. May it please the Court, Assisting United States Attorney Jamie Parks appearing on behalf of the United States. Not now and not ever has Mr. Vasquez-Olea challenged the accuracy of that translation. And at this point in time, he's had one and a half years to listen to the recording and to compare it to the translation. Second, Vasquez-Olea does not object to the very same witness, Agent Tobar, testifying about Vasquez-Olea's Spanish language post-Miranda statement. Third, the witness qualifications were clearly set forth on the record and they were subject to cross-examination. Agent Tobar's qualifications were very similar to those of DEA Special Agent Rosales in a Bonsai Barrera. And as Judge Burns in the first appeal from this case, the district court judge who handled the appeal, said at excerpts of record six, there is no doubt that Agent Tobar is qualified to make a Spanish-English translation as an expert witness. Finally, Vasquez-Olea was offered and refused additional time to review the jail call. At no point in the record does the judge tell him he can't have a couple of hours to look at that translation. At excerpts of record 114 and again at 115, the court inquires of the defendant. On 114, the defendant says, I'm not seeking to continue the trial. On 115, the court asks, how would you otherwise prepare? You want time to read the transcripts? Mr. Barr, on behalf of Vasquez-Olea, does not respond in the affirmative to that question. It's also clear from page 120 of the excerpts of record that the reason that the trial and the motion hearing were together in sort of a compressed format was at the request of the defense. Counsel, then let me tell you what bothers me about this case. Yes, Your Honor. Isn't threatening Mr. Vasquez-Olea with a semi-automatic pistol placed him in custody and not make this a Terry Stop? And therefore, the question arises to whether there was probable cause. I do not believe so, Your Honor. There's a long line of cases where law enforcement officers engage in Terry Stop detentions and ask questions that are related to developing probable cause where handguns are involved. That includes Gallegos, which is a gunpoint detention. And in that case, the court says, our cases have made clear that an investigative detention does not automatically become an arrest when officers draw their guns. There's also Buffington, where an individual who was believed to be about to rob a bank was put face down on the pavement at gunpoint without converting the Terry detention into a custodial situation that would have required Miranda warnings. Again, there's Allen, which involves handcuffing and firearms. There's Alvarez, which involved firearms drawn. And there's Green, where there was an issue of noncompliance and weapons were drawn. This agent was two hours' hike away from backup, and he was confronted with a situation where he was dramatically outnumbered. There were nine aliens there, and although they were compliant, it was completely appropriate for that agent to withdraw his firearm. And I think the record reflects, or at least it doesn't reflect, that he pointed the weapon at those individuals. Well, you know, it seems to me that the average reasonable person would not feel free to leave at that point with a semiautomatic gun pointed at his head. And the government does not dispute that those individuals were not free to leave at that time. Agent Barr had detained them for the purpose of determining their immigration and nationality, and his questions were narrow in scope. They were even more limited than the questions in Cervantes. In Cervantes, questions were place of birth, citizenship, whether they had documentation to be in the United States, and their means of entry. So are you saying that the not being free to leave task that we usually associate with custody isn't applicable in this sort of cherry-stop situation? I think that's correct, Your Honor, because they are lawfully detained. That is to say, not free to leave on the basis of reasonable suspicion. They were found on a smuggling trail, I believe three miles north of the international boundary, as the crow flies. The agent testified it would have been further away on foot. And the questions he was asking them were those questions specifically tailored to deciding whether they were aliens who ought to have been taken into custody. He asked them where they were from and if they had any papers that authorized them to be there. Those were the only two questions he asked. When they answered those questions in the affirmative that they were from Mexico and know they didn't have any papers, then they were taken into custody. They were hiked out to the transport location, transported to a border patrol station. Which brings me to another point that I think is important about this case. Any error here is harmless, because once Mr. Vasquez-Olea got back to the border patrol station, he was Mirandized and gave a complete confession. So in this situation, we're looking at three sets of the defendant's admissions, which can corroborate each other. And we're also looking at a very persuasive mode of entry evidence, the series of early morning sensor activations beginning at the border and continuing to where Agent Barr began to track the group, in addition to the area in which they were found, which is a desolate mountainous area on a known human smuggling trail. I think the evidence in this case was overwhelming against Mr. Vasquez-Olea. And while I submit that there was no error, either under Rule 16 or any kind of failure to certify Agent Tobar as an expert one way or the other, in the end, Mr. Vasquez-Olea was convicted on the basis of overwhelming evidence of his guilt of this misdemeanor illegal entry offense. Let me ask about his field admission. What if we were to suppress it? Isn't United States v. Hernandez controlling? Hernandez actually stands for the proposition that statements can corroborate each other. And in that case, I believe the court said that a later admission can corroborate an earlier one. So even if you take the field admissions out of the picture, you still have two sets of statements and this overwhelming mode of entry evidence, right? You have the post-Miranda statement, which was extensive. He admitted where he was born, where his parents were born. He admitted his entry. And then you have the May 11th jail call, which is also very persuasive. He admits entering with the same number of people that Agent Bar apprehended that day. He admits his plans to attempt a second reentry into the United States. He discusses the punishment he expects to receive for his crime. He even said, and this was the basis for the government sentencing recommendation at the time of Vasquez-Elliot's sentencing, he even said that if they gave him six months, maybe he wouldn't try again. So you also have those two sets of statements, which, according to Hernandez, can corroborate each other. And then you have the mode of entry evidence. Thank you. Thank you. I have no questions. Thank you. We'll give you a minute for rebuttal. Thank you very much, Your Honor. Just very briefly, with respect to the harmlessness analysis, I think that if the two statements that I've challenged here in my papers do drop out, if the court concludes that they are not admissible, then we're left with a situation where there's a single set of post-arrest statements and some independent observations based on the circumstance of the arrest that the government would suggest is sufficient to corroborate. And I think at the very least, we have a situation that sort of lies between the facts outlined in Hernandez and those in Garcia-Villegas, where in Garcia-Villegas, the individual was seen actually climbing over the fence, and the circumstances of the arrest were significantly different than those that were present here. I think finally that there really is no indication in the record that the trial court was willing to give additional time to me to review the statements that were being offered by Mr. Tobar with respect to the jail call. And I think that the fact that the trial proceeded, despite my request for that additional time, is sufficient evidence that no such opportunity existed. Thank you, Your Honor. Thank you. Okay. The case of United States v. Vasquez-Olea is submitted. Do you want to take a break, or do we want to take a break? Well, we could wait and— After Hall. Do it after Hall. Okay, so we'll next hear the case of Harold Hall v. the City of Los Angeles.
judges: Nelson, Gould, Ikuta